CUMMINGS v. UNIVERSAL PICTURES
CO., Inc.

Civil Action No. 3242–H.

District Court, S. D. California,
Central Division.

March 6, 1944.

612

Joseph L. Lewinson and Loeb & Loeb, all of Los Angeles, Cal., for defendant and cross-complainant.

Joseph J. Cummins and Roth & Brannen, all of Los Angeles, Cal., for plaintiff and cross-defendant.

HOLLZER, District Judge.

This lawsuit arises out of a certain contract of employment entered into between the parties under date of November 21, 1938. The issues requiring determination are presented by the first two counts of the complaint, the answer thereto and the amendments to the answer.

Count one constitutes a cause of action for equitable relief, namely, for termination of said contract upon the ground of the alleged breach thereof by defendant in failing and refusing to pay plaintiff certain compensation claimed to be due thereunder. The second count is a cause of action for the recovery of certain compensation alleged to be owing and unpaid under the terms of said contract.

Defendant relies upon several defenses. It contends, firstly, that plaintiff breached the contract, in that he failed and refused to report at its studio on April 12, 1943, to portray a certain role in a photoplay in which he was then cast, pursuant to its telegraphic notice addressed to him under date of April 10, 1943; that by reason of said breach, defendant became entitled to, and did, exercise the right to engage another person to portray such role, and to refuse to pay plaintiff any compensation until the completion of such role by another person, also the right to extend the term of said contract for a period equivalent to the time required for the completion of such role by another person, and that said role was completed by another person on May 19, 1943.

Secondly, defendant charges that plaintiff further breached the contract, in that he failed and refused to report at its studio on April 12, 1943, and at all times since has failed and refused, to render such additional services as it might require of him under the contract and pursuant to said telegraphic notice; that by reason of said breach it became entitled to, and did, exercise the further right to refuse to pay him any compensation during the period of such failure and refusal, to-wit, the period from April 12, 1943, to date and likewise became entitled to, and did, exercise the still further right to extend the term of the contract for a period equivalent to the period during which such failure or refusal has continued.

Thirdly, defendant takes the position that at and prior to the time of his failure and refusal to report at its studio on April 12, 1943, plaintiff had notified defendant to the effect that he had determined to devote 100% of his time to war work, particularly to sign up with the Civil Air Patrol for the duration of the war, and hence during such period would not engage in the work of making motion pictures; that therefore it became entitled to, and did, exercise the right to suspend him from the payroll, in other words, to refuse to pay him any compensation for the duration of the war; and that until plaintiff should report at its studio and notify defendant that he was ready and willing to resume work under the contract, such suspension would remain in effect indefinitely.

Fourthly, defendant contends that from time to time from about April 5, 1943, to May 28, 1943, inclusive, plaintiff either in person or through his agent, represented to it in substance that he would join the military service for the duration of the war, and for that reason would not report at its studio to portray a role which he had been cast by defendant to portray in a certain photoplay; that on April 13, 1943, defendant notified plaintiff's agent it had received the aforementioned information from plaintiff, also that he had refused to report on April 12, 1943, and that it intended to suspend him from the payroll as of the latter date; that plaintiff's agent replied that its action was proper and that he was endeavoring to have plaintiff come to its studio to discuss the situation; that plaintiff continued as late as May 28, 1943, to lull defendant into the belief that he was not

available for services under the contract, but instead was engaged in work of a military character and that anyone wanting him would have to consult the head of the Army Air Corps; that at all times since April 10, 1943, plaintiff has devoted himself exclusively to the work of the Civil Air Patrol, and as an instructor for the Army Air Force Cadets, that at no time since said date did he intend to fulfill his obligations under the contract, and that ever since July 16, 1943, he has been a member of the Air Force Reserve of the United States Army; that defendant believed, relied and acted upon the aforementioned representations on the part of plaintiff to its prejudice; and hence that plaintiff is without equity and is estopped to claim that defendant breached the contract.

Fifthly, defendant argues that plaintiff further breached the contract in this: That whereas he agreed that until the expiration of the term thereof he would be "available at all times in Los Angeles, California, or at any other place the producer (defendant) may designate, unless excused in writing by the producer" (see contract, paragraph 19) plaintiff absented himself from Los Angeles County continuously from May 19 to May 29, 1943, without defendant's knowledge or consent.

Lastly, defendant urges that, if the Court should find that on May 26, 1943, compensation was owing and due from defendant to plaintiff and that by reason of its failure and refusal to pay such compensation it breached the contract, then such default resulted from an excusable mistake on its part, that it is entitled to be relieved from such default, and to that end it is willing and offers to pay to plaintiff any compensation the Court may find due him and also otherwise to do full equity.

At the opening of the trial, the Court stated, in effect, that, taking into consideration the admissions made by the pleadings and the further facts incorporated in the stipulation of facts filed herein, a prima facie case entitling plaintiff to judgment upon the first count would be established upon proving the allegations of the last sentence of paragraph VI and the allegations comprising the first sentence of paragraph VII of said count. The last sentence of paragraph VI reads as follows:

"No demand, oral or written, was made by defendant at any time after April 10, 1943 that plaintiff report to defendant in connection with any other picture or for any services pursuant to said contract."

The first sentence of paragraph VII reads:

"On May 26, 1943, plaintiff, pursuant to the terms and provisions of said contract, appeared at the offices of the defendant and demanded of defendant payment of salary as fixed by said contract for that portion of the week beginning May 19, 1943 and ending May 22, 1943."

Save in the particulars hereinafter pointed out, the evidence establishes, without substantial contradiction, the following facts: Between the date of the execution of the contract involved herein and March 28, 1943, plaintiff had protrayed roles in at least fifteen photoplays, eleven of which had been produced by defendant, and with its consent he had appeared in additional motion pictures produced by others. Excepting the last three months of 1942, he had been occupied during at least a portion of each month of that year in performing services under said contract. During March, 1943, more particularly between the 10th and the 23rd thereof, he had portrayed a role in the last photoplay in which he worked for defendant.

Prior to February, 1943, disputes had arisen between plaintiff and defendant, particularly one of defendant's executives named Daniel Kelley, who was in charge of its creative talent, including players, writers, directors and producers. These differences arose out of complaints by plaintiff's criticising the quality of the photoplay productions in which defendant required him to appear, including such matters as the type of play, the cast and the director. About February or March of the same year, these difficulties became so acute that the relations between plaintiff and Kelley became quite strained and as a consequence the latter was replaced, so far as defendant's dealings with plaintiff were concerned, by one Robert Speers, another executive, who was defendant's casting director. Thereafter, and extending over a period of at least several weeks prior to April 10, 1943, several conversations were had between Speers and plaintiff, and the latter's agent, Oscar Cummins, some with the former and some with his agent, on the subject of defendant's proposed production of a certain photoplay entitled "Fired Wife." These discussions dealt primarily

with such matters as the quality of the production, the script for the same, the contemplated cast, the type of director and the role which plaintiff would be asked to portray, namely, that of Hank.

About the first week of April, 1943, plaintiff and Speers held a lengthy conference which lasted from two to three hours, and during which the latter disclosed for the first time certain detailed information respecting said picture, particularly who had been selected to direct the making thereof and also the names of the principal members of the cast. Plaintiff took vehement exception to what he characterized as cheapening the production. He complained that the direector was not qualified and was not sufficiently experienced to direct the making of a first-class photoplay, and, further, that the actress selected to portray the feminine lead and also certain other members of the cast lacked the requisite qualifications to portray the respective roles to which they had been assigned. He also charged that Speers had represented to him that the photoplay would be produced as a Class A or highest quality picture in every respect; that the picture would be directed by an outstanding director in the motion picture industry, comparable to one Leo McCarey, that the feminine lead would be portrayed by Teresa Wright and that other principal parts would be portrayed by Charles Coburn and Eddie "Rochester" Anderson, all being outstanding artists in said industry. He also insisted that relying upon such representations he had consented to portray the role of Hank in the picture and that the proposed production as finally then being diclosed to him was a repudiation of such representations. He pointed out that he was a professional flyer, as well as a professional actor; that the services of the former were then greatly in need and that rather than waste his time making a motion picture, which he did not feel would do anything for the war effort, he should fly for the Civil Air Patrol. During this conference, Speers asked plaintiff whether he felt he should stay in the Civil Air Patrol for the duration, to which he replied that he was in the Civil Air Patrol for the duration, but that this had nothing to do with whether he made pictures or not. The former insisted that plaintiff's objections to the director and the cast were not well founded, and that the production of the picture would prove to be one of the best. Likewise, he reminded plaintiff that he had volunteered to be the intermediary between the latter

and Kelley, also that this was the first time since the latter's differences with Kelley that it had become possible to work with him on amicable terms about a production, and that this was their first opportunity to get together, and he was anxious to make a go of it. He added that it would be painful to him to see this first sort of reunion between plaintiff and himself fail, although it meant nothing to him in a monetary way and affected only his pride, and that a refusal on plaintiff's part to do the picture might lead to a suspension.

Plaintiff, however, took the position that if it were necessary for him to be suspended because of such a production, he would fly for Lockheed or the Civil Air Patrol during the suspension, because he didn't feel like wasting time making a picture, which he described as "crap," and that he was not going to sacrifice what he had built up over a period of years to make a production which he didn't feel had any value to the public or to himself.

During this conversation, they also discussed other subjects, including the war, navigation, and the things plaintiff was teaching and other matters pertaining to flying, in which they were mutually interested. Plaintiff commented how badly he felt that because of his age he was not allowed to enlist in any of the flying activities of the Army or the Navy and that he could not be accepted either as a cadet or in the flying crews. At the close of their talk, plaintiff stated it would be necessary for him to confer with his agent, Oscar Cummins, before reaching a final conclusion.

Shortly thereafter, according to the testimony of Cummins, and prior to April 12th, the latter conferred at defendant's studio with Speers and another of its executives, named Edward Muhl, head of its Contract Department, in an attempt to adjust the then existing difficulty, and upon said occasion plaintiff's agent suggested that the problem could be solved by having another director assigned for the picture, but this suggestion was rejected. This testimony has not been contradicted.

Some days later, this discussion was resumed over the telephone. Upon the latter occasion, according to plaintiff's testimony, the latter stated that, inasmuch as the picture "Fired Wife" had been cheapened both with respect to the director and the cast, he would not play the role of Hank. He further said that he felt the picture would not be made as it had been represented to him

by Speers, namely, as an "A" or first-class production, but, instead, would prove to be a "B" or second-class production, and that, rather than waste his time on such a production, he would fly for Lockheed testing bombers, or fly for the Civil Air Patrol. Speers retorted that plaintiff was putting the studio in a terrific hole, and he evidenced resentment at plaintiff's attitude, and likewise pointed out that the position plaintiff was taking might lead to his suspension. To this the latter replied that if such action on his part meant suspension, it would have to mean that, because he did not feel like playing the part of Hank.

Save in the particulars hereinafter to be noted, plaintiff's version of these two conversations is corroborated, or at least not disputed, by the testimony of Speers. In this connection it should be observed the latter testified that before taking the stand he had refreshed his recollection as to what had been said, by reading a memorandum contained in one of defendant's files and which had been recently called to his attention. This memorandum, he stated, had been dictated by him about three months after the conversations had taken place, and purported to be an inter-office communication to Muhl from himself. It recited, in substance, that on April 10, 1943, he had a long talk with plaintiff about him doing "Fired Wife," that the latter informed him *he was on the verge of refusing to do the picture,* partly because he was unhappy about the selection of the director and *partly because he was seriously thinking of signing up with the Civil Air Patrol or the Army for the duration of the war,* that Speers had pointed out to him why such a refusal would be unfair, and that plaintiff replied he could not make up his mind whether or not to do the picture; also that during a telephone conversation held two days later plaintiff stated he had made up his mind not to do the picture, because he felt it to be his duty to give 100% of his time to war work and was signing up with the Civil Air Patrol for the duration. (Italics ours)

Shortly following said telephone conversation, according to the testimony of Speers, Kelley, and Emmett Ward, assistant to Muhl, a conference was held between the three of them, during which Speers reported he had just been informed by plaintiff on the telephone that the latter would not play the role of Hank, also that he had signed up, or was going to sign up, for the duration of the war with the Civil Air Patrol, or some other military service, also that he would not do any more pictures for the duration, *and knew that he was something of* ——, *but there was nothing he could do about it.* (Italics ours)

Likewise, Kelley testified that a few days before the above mentioned conference Speers had told him about a prior conversation which Speers had had either with plaintiff or his agent, Oscar Cummins, in which one of the latter two *complained about the director for the picture "Fired Wife," claiming that he was not of a caliber who should direct plaintiff and that with such a director set-up the picture was not important for plaintiff. However, this witness had no recollection that at the time Speers reported to him concerning this prior conversation the latter had claimed that either the plaintiff or his agent had said that plaintiff was thinking seriously of going into the Civil Air Patrol.* Likewise, according to Kelley, it was the latter who suggested either to Muhl or to Ward that a wire be sent to plaintiff to find out if it was true that he would not be able to do any more pictures for the duration. (Italics ours)

Ward further testified that about April 9, 1943, he caused to be prepared a proposed letter to plaintiff and submitted the same to Muhl for the latter's signature. However, *this document was never signed* and, according to Muhl, *it was upon his decision that the same was not sent.* The first paragraph of the proposed letter—being the only portion having any significance in the present lawsuit—was worded as follows:

*"You have* heretofore *notified Mr. Robert Speers,* by telephone, that *you have been listed in* the *Civilian Air Patrol for the duration of* the *present war and will therefore be unavailable to us for the rendition of any services* pursuant to your contract of employment with us dated November 21, 1938, as heretofore amended and extended. This is to notify you, therefore, that, commencing as of April 9, 1943, said contract of employment with us dated November 21, 1938, as amended and extended, shall be and is hereby suspended, both as to compensation and as to the running of the now current term of employment of said contract." (Italics ours)

On Saturday, April 10th, Speers instructed his secretary to deposit with Western Union Telegraph Company three telegrams, each addressed to the plaintiff and bearing

the date last mentioned. One of these telegrams was addressed:

"Mr. Robert Cummings
"Care Oscar Cummins
"8511 Sunset Boulevard
"Los Angeles, California."

Another telegram was addressed:

"Mr. Robert Cummins
"Care Oscar Cummins
"527 California Bank Building
"Beverly Hills, California."

The third telegram was addressed:

"Mr. Robert Cummings
"14111 Sherman Way
"Van Nuys, California."

Except as to the address thereof, each telegram was worded identically and read as follows:

"*You are* hereby *instructed to report* to us at *our studio* at Universal City, California, *at 10 o'clock Monday morning, April 12, 1943, for the rendition of your services* under your contract of employment with us dated November 21, 1938, as heretofore amended and extended, *in connection with the portrayal of a role in our photoplay* now entitled *"Fired Wife" and/or the rendition of such other services as we may require* under said contract, as amended and extended.

"Universal Pictures Company, Inc.,
"By Edward Muhl
"Assistant Secretary"

(Italics ours)

On the same day, *at approximately 6 P. M., Speers' secretary left these telegrams at the Beverly Hills office of the Telegraph Company.* At about 10 A. M. *on the following day Western Union telegraphed* defendant to the effect that the *locations described, respectively, as 527 California Bank Building, etc. and 8511 Sunset Boulevard, etc. were closed until morning,* also that the person addressed at 14111 Sherman Way, etc. was out of the city and his address unknown, and that the company had telephoned to Mrs. Oscar Cummins, who would relay the message. On Monday, April 12th, at about 6 P. M., the Telegraph Company wired defendant to the effect that the telegram addressed to 527 California Bank Building, etc., had been telephoned on the preceding morning to the addressee's sister-in-law, who would relay the message to him.

The plaintiff, also his agent, also the latter's wife and brother, each testified, denying receiving any such message, either in whole or in part. Plaintiff further denied that he had any sister-in-law, although it was admitted there had been occasions when his agent claimed to be his brother. Even though we discount such denials, nevertheless, in the light of the aforementioned reports made by the Telegraph Company to defendant, it is obvious that none of the telegrams was delivered in the customary manner, either to plaintiff or to his agent, or, in fact, to anyone purporting to be in contact with him. As pointed out by the Court at the close of the oral argument, while it is probable that on April 11th one or more of the telegraph company's employees read the telegram of April 10th over the telephone to someone claiming to be plaintiff's sister-in-law and who promised to relay this message to him, it is inherently improbable that the party hearing the same copied it down or remembered all of its contents. Likewise, the most that may reasonably be drawn from that incident is that the lady who received this telephone message construed the same as a telegram from defendant, requiring plaintiff to report at its studio the next morning to perform services in connection with a photoplay entitled "Fired Wife", and that she repeated this much of the message and nothing more, either to plaintiff or his agent either the same day or the next.

According to Speers, within a day or two of this last telephone conversation with plaintiff, he was informed by the latter's agent over the telephone that said agent had talked to plaintiff about his refusal to work in the picture; also that he still had hopes of getting his principal to do the picture, and promised to communicate later with Speers. Because of such promise the latter claimed he had delayed sending the telegrams until late on April 10th.

At this point, it should be noted that while both Kelley and Ward testified that early in April, 1943, Speers had reported having held a telephone conversation with plaintiff, in substance as described by him on the witness stand, *neither of said witnesses corroborated his testimony to the effect that he reported having had a prior conference with plaintiff wherein the latter allegedly asserted that he was seriously thinking of going into the Civil Air Patrol, or otherwise made any reference to engaging in military service. Likewise, there is an absence of corroboration of*

*Speers' testimony to the effect that following his last telephone conversation with plaintiff, the latter's agent promised to communicate with the former relative to getting plaintiff to do the picture.*

In this same connection it is appropriate to consider a certain affidavit, verified by Speers on October 21, 1943, and filed in support of defendant's application for an injunction pendente lite herein. This affidavit purports to set forth important parts of the discussion had between plaintiff and Speers at the latter's office in April, 1943, and also calls attention to what plaintiff allegedly told him over the telephone about two days later. It is significant that in said affidavit, although Speers does aver that during the office conference *plaintiff told him "that he was considering refusing to render his services in said photoplay* ('Fired Wife') *for the principal reason that the director selected for said photoplay did not meet with his approval and also because he was thinking of signing up with the 'Service' for the duration of the war,"* and while he does further assert that in the subsequent telephone conversation plaintiff stated that "he had decided not to render the services requested of him by Universal and would not appear at the studios of Universal to portray the said role" (of Hank), *Speers does not allege therein either in words or in substance that plaintiff told him that he had signed up or was going to sign up for the duration of the war with the Civil Air Patrol or some other military service, and that he would not do any more pictures for the duration, or that plaintiff made any similar statement in whole or in part.* (Italics ours.)

In addition, Muhl testified that prior to April 10th he was informed, first by Ward and later by Speers, to the effect that plaintiff would not portray the role of Hank and that defendant would receive no more of his services for the duration of the war, because he was signing up with the Civil Air Patrol or some other organization connected with the Army Air Corps.

Likewise this witness and also Kelley asserted that they believed and relied upon such information, and when it was learned that plaintiff had failed to report at the studio on April 12th, and upon being advised by the Contract Department that it would be lawful to suspend plaintiff for the duration of the war, instructions were issued to that effect and accordingly *defendant suspended plaintiff on that date for* *the duration of the war and stopped his compensation for the same period.* (Italics ours.)

Reading from a memorandum, which he explained had been dictated by him a few minutes after the conversation referred to therein had taken place, Muhl testified that on April 13th in a telephone conversation had with Oscar Cummins on that day, he informed the latter that following plaintiff's statement to Speers over the telephone that he was in the Civil Air Patrol for the duration and would not report for his role in the photoplay "Fired Wife," defendant had wired plaintiff to report on April 12th to Kelley; that he failed to do so, and to establish a clear position, defendant intended to suspend him from the payroll as of that date; also, that plaintiff's agent replied that such action was proper, that he was sick at the situation, also that he had talked to plaintiff the preceding night and was trying to get him to come in for a further discussion with Speers and Muhl; also that Muhl stated that defendant would recast the role, to which said agent replied he understood defendant would have to do this, but he didn't think the situation was fair to plaintiff or to the studio or to plaintiff's country and he would like to straighten it out.

On the other hand, plaintiff's agent has testified that at no time when conversing with Muhl or Speers or any other employee of defendant did he state that plaintiff was unavailable for the duration of the war because he had joined the Civil Air Patrol, or any branch of the Air Forces, or for any other reason, and that on none of these occasions was any reference made respecting what service plaintiff would render for the Civil Air Patrol. He has further denied that in any such conversation there was any mention made to the effect that a wire had been sent to plaintiff to report at defendant's studio, or that he expressed approval of defendant's action suspending plaintiff, although said witness conceded defendant was entitled under the contract to suspend him for the period required by a substitute to portray the role of Hank.

As admitted by the pleadings, on April 15th defendant served upon plaintiff a notice, the body of which read as follows:

"This is to notify you that by reason of your failure, refusal or neglect to perform your obligations under your contract of employment with us dated November

618

21, 1938, as heretofore amended, and *particularly by reason of your failure, refusal or neglect to report to us on April 12, 1943* in accordance with our notice to you dated April 10, 1943, we elect to and do hereby exercise the right granted us under the provisions of *paragraph 12* of said *contract* to *refuse to pay you any compensation during the period of such failure, refusal or neglect.*

"At the time of such failure, refusal or neglect you were cast to portray a role in a photoplay, to wit: the role of 'Hank' in the *photoplay* now entitled 'Fired Wife.' By reason of your failure, refusal or neglect, we are engaging another person to portray such role. We accordingly elect to and do hereby exercise the further right granted us under the provisions of said *paragraph 12* of said contract to *refuse to pay you any compensation until the completion of such role by such other person.*

"This notice is served upon you without prejudice to or waiver of any other rights and/or remedies which we may have in the premises, all such other rights and/or remedies being expressly reserved by us." (Italics ours.)

Upon May 18, 1943, defendant served upon plaintiff an additional notice, the body of which read as follows:

"Your employment under your contract of employment with us dated November 21, 1938, as heretofore amended, has been *suspended by reason of your failure, refusal* and/or neglect *to perform your obligations* under said contract, as amended, for a period of five (5) weeks and two (2) days *commencing April 12, 1943.* This is to notify you that *we* have elected and do hereby *exercise* the *right* granted under the terms of said contract, as amended, *to extend* the *term of your employment* thereunder for a *period equivalent* to the *suspension* by reason of said failure, refusal and/or neglect.

"Your employment under said contract, as amended, *will be further suspended during* the *continuance* of *your present failure,* refusal and/or neglect *to perform your obligations* thereunder, and we reserve the right to extend your employment under said contract, as amended, for an equivalent period.

"This notice is served upon you without prejudice to or waiver of any other rights and/or remedies which we may have in the premises, all such other rights and/or remedies being expressly reserved by us."

On Wednesday, May 26th, according to the testimony of plaintiff's agent, also that of the latter's secretary, also that of plaintiff's former chauffeur, each of these individuals requested the delivery of the weekly salary check for plaintiff, that in each instance an employee of defendant, either in the paymaster's office or in the cashier's department, replied in substance that plaintiff was under suspension and therefore no salary check was ready.

It further appears from the testimony of Kelley that on May 28th he had a telephone conversation with a Mr. Ben Thau, a producer for Metro-Goldwyn-Mayer Studio, relative to the subject of that studio employing plaintiff to do a picture for it. Reading from a memorandum alleged to have been prepared by his secretary from stenographic notes made by her upon said occasion, he testified, in substance, that *Thau informed him that Metro-Goldwyn-Mayer desired to employ plaintiff to portray a role in a photoplay it was proposing to produce;* that *Kelley replied that Cummings was on suspension,* "he just refused to do a picture over here," that *it was* "one of those things again, he said he would rather do pictures on the outside";* that *Thau added, "We have a* great part here"; *whereupon Kelley retorted "We wouldn't let him go on the outside; if we did that, he would never do a picture here;* he claims he can't do a picture on account of being in the army"; that thereupon *Thau commented, "We could use him here,"* to which this witness answered, "we *can't do that; he is under suspension";* that this conversation continued in a similar vein, Kelley adding that defendant then had a picture into which it could put plaintiff, also that the latter had worked in the Boyer picture and was all set to do another, "that everything was fine and he was tickled to death, and two days before the picture was to start he called and said he couldn't work and was going into the Civil Air Patrol, so that's the situation." (Italics ours.)

According to Muhl, on May 28th the latter and Oscar Cummins held a telephone conversation, a memorandum of which was allegedly dictated by him a few minutes later. Reading from said memorandum Muhl testified that upon said occasion he told plaintiff's agent he had heard a rumor that Metro was interested in plaintiff and

inquired whether he knew anything about it; that Cummins answered in the negative and further stated that P. R. C., a producing organization, called him to ask about plaintiff's availability and that he advised them that plaintiff was engaged in work connected with establishing an air shuttle service, and that anybody wanting him would have to see General Arnold of the Army Air Corps; and that the witness asked Cummins if anybody had suggested to Metro that plaintiff's suspension had been terminated or that he was free either from his contract with defendant or to work with anybody else, and that plaintiff's agent replied he was positive there was nothing like it.

On the other hand, the latter denies having talked with Muhl on May 28th, or having had a similar conversation at any other time, except he does admit that on a much earlier date, and during the course of a conversation wherein they talked about changing some of the terms of plaintiff's contract and thereby adjusting the then existing controversy, Cummins mentioned that P. R. C., a producing organization, had inquired whether plaintiff would be available to work in a picture it intended to produce.

At the trial it was stipulated that on May 29, 1943, plaintiff sent and defendant received the notice, a copy of which is set forth in paragraph VIII of the complaint, and that on or about June 2nd defendant sent and plaintiff received the notice set forth in haec verba in paragraph IX of the complaint. The first of these documents was worded as follows:

"May 29, 1943.

"Universal Pictures Co., Inc.
"Universal City, California

"Under date of May 18, 1943, you notified me that you considered my contract with you dated November 21, 1938, suspended for a period of *5 weeks and 2 days, commencing April 12, 1943*, and you purported to exercise a right of extension with respect to said alleged suspension.

"Under second paragraph of said letter, you state that said contract is further suspended after the expiration of said period because of my purported failure, refusal and/or neglect to perform my obligations thereunder. As you are well aware, *there has been no failure, refusal and/or neglect of my part to perform my obligations un-*

*der said contract at any time since the expiration of said period of 5 weeks and 2 days, assuming, without admitting,* that *there was such a failure with respect to said period of 5 weeks and 2 days. Assuming that you had the right of suspension for said period of 5 weeks and 2 days, such suspension would have ended on May 18, 1943.* Accordingly, compensation was payable to me under said contract for the period after May 18, 1943. On May 26, 1943 (on which date compensation under said contract was payable to me), at or about 2:30 *p. m., demand was made upon you for the payment of the compensation due and payable on said date.*

"At said time, you failed and refused to pay me the compensation which was due and payable under said contract. Such failure and refusal was a material breach by you of your obligations under said contract and I hereby notify you that I elect to and do hereby terminate said contract by reason of such failure and refusal.

"This notice is served upon you without prejudice to or waiver of any other rights and/or remedies which I may have in the premises, all such other rights and/or remedies being expressly reserved by me." (Italics ours.)

"Robert Cummings."

The other notice was on the letterhead of defendant, was dated June 2, 1943, and read as follows:

*Registered Mail*
"Mr. Robert Cummings
"c/o, Oscar Cummins
"9441 Wilshire Boulevard
"Beverly Hills, California

"Dear Mr. Cummings:

"This is to acknowledge receipt of your telegram of June 1, 1943.

"Please be advised that despite your purported termination of your contract with us, dated November 21, 1938, we will continue to treat and consider said contract as being in full force and effect.

"In our notice to you under date of May 18, 1943, we notified you that your employment under said contract, as amended, would be further suspended during the continuance of your failure, refusal and/or neglect to perform your obligations thereunder.

"At no time since April 12, 1943, up to and including the present time, have you

notified us of your willingness to perform pursuant to the terms of said contract, as amended. If you are willing to resume your services under said contract, as amended, please notify Mr. Muhl at our studio, and upon your reporting pursuant to such notification, we will terminate the suspension of your employment. Failing such notification by you, your employment will continue in suspension during the continuance of your present failure, refusal and/or neglect to perform your obligations under said contract, as amended, and until you do report ready to resume and perform your services under said contract, as amended.

"We reserve the right to extend your employment under said contract, as amended, for a period equivalent to the period of such suspension, and this notice is served upon you without prejudice to or waiver of any other rights and/or remedies which we may have in the premises, all such other rights and/or remedies being expressly reserved by us.

"Very truly yours,

"Universal Pictures Company, Inc.

"Edward Muhl By Edward Muhl

"jab/j     Assistant Secretary"

It was further stipulated that since May 29, 1943, there had been an interchange of notices and letters from defendant to plaintiff and from the latter to the former, the purport of which is that defendant claims the contract still exists between them, whereas plaintiff claims that by reason of defendant's material breach thereof the contract has been terminated by him as of May 29, 1943. Likewise, the parties have admitted that all written notices, copies of which are appended to any of the pleadings and plaintiff's affidavit filed in connection with the motion for summary judgment, etc., may be considered authentic and as having been sent and received, as the case may be, by the parties therein designated, and also that since the commencement of the instant suit defendant has sent and plaintiff has received two other notices, dated, respectively, November 15, 1943, and December 20, 1943. Each of these notices was worded similar to that of May 18, 1943, except that the period of suspension specified in the one dated November 15th consisted of five weeks commencing October 11, 1943, while the period of suspension in the other was specified as five weeks commencing November 16, 1943.

On June 3rd plaintiff's agent telephoned to Muhl and requested an appointment for the purpose of endeavoring to adjust the then existing difficulty between plaintiff and defendant.

Reading from a memorandum alleged to be a transcript of the stenographic notes made upon said occasion by his secretary, Muhl testified that in the course of that telephone conversation Cummins asserted he wanted to discuss this matter privately and if there be any hope to work anything out he would like to do it, and that to this remark Muhl replied that since the matter was in a formal phase and as long as the status thereof was that of a clinch, their talk could not be completely private and confidential, and that he suggested plaintiff's agent contact him further about the middle of that afternoon.

Subsequently and on the same day Cummins and Muhl conferred in the latter's office, Ward also being present. Again refreshing his recollection from a memorandum alleged to have been dictated by him within a few moments after the conclusion of their talk, Muhl testified that during the course of said conference plaintiff's agent asserted that, when he had talked to the latter over the telephone the preceding week, he had known nothing about the position being taken by plaintiff; also that the situation between the latter and defendant had been reviewed by himself, his brother and a former Justice of the California Supreme Court and they had decided defendant had breached the contract, outlining his reasons for such conclusion, and also stating he wanted to avoid litigation, if possible; that he further claimed demand for plaintiff's compensation had been made on May 26th by two persons, but that no check for the same had been obtained; and that a similar request had been made upon defendant's treasurer, who answered that there was no check for plaintiff since he was on suspension. During that same conference, according to Muhl, the latter stated that defendant also desired to avoid litigation and he denied that it had breached the contract; also that Cummins *outlined a proposition for modifying the terms of the contract,* which proposal Muhl informed him could not be entertained; that in addition the latter told him there had been a deliberate effort to entrap defendant in a legal situation to the end that plaintiff would be relieved of his responsibilities under the contract, but that he did not ac-

cuse Cummins of this since the latter had assured Muhl he did not know of plaintiff's plan.

Cummins, however, denies that during the aforementioned conference he stated that when he talked with Muhl the previous week he had known nothing about the position being taken by plaintiff, or that the situation between plaintiff and defendant had been reviewed by a former Justice of the California Supreme Court, or any other Judge, and further denies that any accusation was made as to an effort to entrap defendant.

It is significant that *in a certain affidavit, verified by Muhl on November 3, 1943, and filed in support of defendant's application for an injunction pendente lite herein,* he asserted that the telephone conversation which on the witness stand he specified as having occurred on May 28th took place on March 28, 1943. Likewise, in the same affidavit, although it is averred therein that at all times since plaintiff's suspension, defendant has understood and believed he would not and did not intend to render services for it, or otherwise was willing to resume his obligations under the contract between them, *nowhere in said document is there any statement to the effect that plaintiff had represented, or that Muhl had been informed he had represented, that he would devote 100% of his time to the war effort, or that he had signed up for the duration of the war with the Civil Air Patrol, or any other military service, or that he would not work in pictures for the duration of the war.*

In this same connection, it should also be noted that *between April 13th and May 28th Muhl and plaintiff's agent had,* according to the former, at least two and possibly three, and according to the latter, perhaps six, *conversations, in each of which they talked about suggestions* made by *Cummins to the effect that plaintiff's employment be arranged on a different basis, also that one of these suggestions was that plaintiff be released from working exclusively for defendant, that, instead, he should do one or two pictures a year for the latter, reserving the right to work for some other studio, and likewise that he was thinking of going into government work and desired or expected to devote part of his time to government service.*

It should further be observed that, *according to Muhl, either in the latter part* of April or fore part of May, 1943, he had *a conversation with a Mr. Prinzmetal of Metro-Goldwyn-Mayer Studio and that upon said occasion the latter inquired as to what position defendant would take in the event Metro-Goldwyn-Mayer could get plaintiff to do a picture for them and also suggested if this could be accomplished it might prove a way of solving the difficulty then existing between plaintiff and defendant. Yet at no time during that discussion did Muhl assert or even suggest that plaintiff had arranged, or had represented that he had arranged, to devote all of his time for the duration of the war to some military service of the United States and therefore it would be impossible to get him to do a picture, or that therefore it was useless to discuss such a proposition.*

Likewise, it is pertinent to point out that *during the various conversations had subsequently to April 10th between Muhl and plaintiff's agent*—the former admits there were at least six, while the latter claims there were several more—*there was not a single instance when Muhl took the definite, unequivocal position of declining, upon the ground that plaintiff theretofore had undertaken to devote 100% of his time to some government service, to discuss the subject of modifying the terms of plaintiff's contract whereby the latter would be allowed to make less pictures for defendant and be enabled to make some pictures for others.* Indeed, according to Muhl, in only two of these conversations was any reference made to the matter of plaintiff being, or of his becoming, connected with the Civil Air Patrol, or any other military service.

Again, it is significant that *in the conversation had between Kelley and Thau of Metro-Goldwyn-Mayer the former likewise did not take a definite, unequivocal stand, namely, refuse to discuss the matter of another studio employing plaintiff to do a picture upon the ground that the latter had become connected with some military service for the duration of the war, devoting all of his time to the same, or even that he had so represented, and hence it would be useless to discuss the subject.* On the contrary, upon said occasion, according to *Kelley,* the latter *stated to Thau "It is one of those things again; he said he would rather do pictures on the outside."* (Italics ours.)

At least two of defendant's executives— *Speers and Muhl*—stated that for some

months prior to April, 1943, they had known about plaintiff being in the Civil Air Patrol, also acknowledged having seen him in the uniform of the latter organization upon at least one occasion, and *further admitted that during said period each had held conversations with him wherein he had related some of his experiences with the patrol, also had explained his status therein, what he was doing in it, and that he had disclosed he could resign therefrom at any time.*

According to plaintiff,—*his testimony on this point stands uncontradicted*—*he joined the Civil Air Patrol in the early part of 1942 but has never signed up for or gone into active service with that organization.* Likewise, in the aforementioned affidavit made by Muhl, the latter averred, among other matters, the following:

"A letter dated July 6, 1943, written over the signature of 1st Lt. J. W. Gilges, an intelligence officer attached to the Seventh Army Air Force Flying Training Detachment at Oxnard, California, requesting certain information regarding Cummings, was received by Universal. From the contents of this letter we had reason to believe and still believe that Robert Cummings applied for enlistment in some capacity in the Army Air Forces. The Los Angeles Times carried a news item dated July 17, 1943, that Cummings 'now is serving as an instructor for the Army Air Force cadets at the Mira Loma Flight Academy...... Cummings was sworn into the Air Force Reserve this week......and had been assigned to his first class of cadets."

In addition, the entries kept in the log covering plaintiff's airplane operations for the Civil Air Patrol disclose that *he made numerous trips for that service between the latter part of May, 1942, and the corresponding period in 1943. On each of these trips he flew beyond Los Angeles County, and on most of them he flew to points beyond this state.* Two of these trips were made on May 23rd and 24th, respectively; another, on August 16th, still another on September 12th, two were made on Sept. 13th; there were three on September 14th, also two on October 11th, another on October 12th, still another on October 30th, also two on October 31st and four were made on November 1st; there was one trip on each of the days of November 6th, 7th, 8th, 16th and 20th to 30th, inclusive, also one trip on each of the days of December 1st, 2nd and 3rd; there were two trips on

each of the days of December 4th, 5th and 6th; a single trip on each of the days of December 7th, 8th, 9th, 11th, 13th to 18th, inclusive, also a single trip on December 27th, another on December 28th; two trips on December 29th and a single trip on December 30th, all in the year 1942. Again, in the year 1943 he made one such trip on each of the days of January 3rd, 6th and 9th, also two trips on January 10th, one trip on each of the days of January 11th, 12th, 13th, and 15th, also two trips on January 16th, another trip on January 17th, still another on January 18th, and two trips on the 19th of that month. On March 28th, he flew on two trips; again, on April 11th he made four trips, and on the 22nd of the same month he made another trip. He made one trip on May 7th, two trips on May 8th, also one trip on each of the days of May 9th, 10th, 19th and 20th, likewise, two trips on May 21st and again on May 22nd, also three trips on May 23rd, a single trip on each of the days of May 24th, 25th and 27th, and two additional trips on May 28th.

In view of these log entries, also the admissions on the part of Speers and Muhl, respecting their knowledge for a period of months prior to April, 1943, concerning plaintiff's affiliation with and participation in the operations of the Civil Air Patrol, and taking into consideration plaintiff's uncontradicted testimony upon the same subject, *it is quite likely that plaintiff was continuously absent from Los Angeles County during several distinct and separate periods between September 13, 1942, and May 28, 1943. Likewise, it is altogether improbable that such executives as Speers, Muhl and Kelley among defendant's officials were ignorant of those facts. Rather does the evidence persuasively warrant the inference that these officials recognized such activities on the part of plaintiff as being in furtherance and in support of the war effort and accordingly approved the same.* So far as the record discloses, *prior to April 10, 1943, defendant had had no difficulty in contacting plaintiff whenever necessary, either directly or through his designated agent.*

*The contract, in paragraph 15 thereof, provides,* in part, that: *"All notices which the producer* (defendant) *is required or may desire to serve upon the artist* (plaintiff) under or in connection with this agreement *may be served by addressing the same to the artist* at *such address as may be des-*

ignated from time to time in writing by the artist * * * and, in any case, * * * by sending the same, so addressed, by telegraph, * * *. If the producer elect * * * to send the same by telegraph * * *, then the date * * * of delivery thereof to the telegraph or cable office, as the case may be, shall be the date of the service of such notice."

*It is undisputed that on or about November 27, 1941, plaintiff, in writing, advised defendant that all written notices which the latter was required or might desire to serve upon him or in connection with said contract be addressed to him "care of Oscar Cummins. 8511 Sunset Boulevard, Los Angeles, California," and that said designation was furnished to defendant upon one of its forms provided for such purpose.* Likewise, it was shown that the last mentioned address had been the business address of both plaintiff and his agent until about the end of May, 1942, *at which time* plaintiff's agent removed to *Suite 527 California Bank Building, Beverly Hills, California. and simultaneously plaintiff's business address was established at the same place where it remained until after the commencement of the present litigation.* In view of the various telephone messages exchanged and the conferences had between plaintiff and one or more of defendant's executives prior to April 10, 1943, and also the many telephone messages exchanged and the conferences had between plaintiff's agent and one or more of defendant's executives, some of which were held prior and the remainder subsequent to that date, *it is reasonable to conclude that defendant had no difficulty contacting plaintiff through his agent.*

*It is not disputed that plaintiff informed Speers he would not appear in the picture "Fired Wife"; likewise that he did not portray any role therein, nor did he report at defendant's studio on or after April 12, 1943; that, subsequent to the last mentioned date, defendant proceeded with the production of said picture, employing a substitute to portray the role of Hank, and that the same was completed on May 19th of that year.*

*At the trial it was also stipulated that under the contract plaintiff became entitled to compensation on May 26, 1943, at the rate of $250.00 per day for three days of the week, ending May 22nd, and that subsequently he became entitled to additional compensation at the same rate for* the week ending May 29th, unless the Court should decide that defendant was entitled to suspend him at all times from and after May 20th, as it undertook to do. *Likewise it was stipulated that defendant failed to pay any salary to plaintiff on May 26th, 1943, also that no salary has been paid to him since said date by defendant or on its behalf;* and that at all times mentioned in any of the pleadings Oscar Cummins was plaintiff's agent and representative and duly authorized to talk and act in all matters in which he purported to, or did, talk or act. *It was further stipulated that no written demand was made by defendant at any time after April 10, 1943* (other than the telegram of April 10, 1943) that plaintiff report to *defendant in connection with any picture other than "Fired Wife," or for any services pursuant to said contract.*

The contract involved herein provides, in part:

"2. The artist (plaintiff) agrees that * * * he will render the services hereinafter specified, * * *; that he will render his services as an actor in such roles and in such photoplays and/or other productions as the producer may designate; that he will make personal appearances in motion picture theatres and/or other places of entertainment and/or will render his services as an actor in vaudeville, plays and/or in all other kinds of performances on the speaking stage; that he will render his services as a radio performer, not only by broadcasting in person, but also by making electrical transcriptions and/or by any other present or future methods or means; that he will render his services as an actor in television productions; and that he will render his services in connection with the broadcasting and/or transmission of his likeness and/or voice by means of television, radio, and/or otherwise, whether such broadcasting and/or transmission be either directly or indirectly in connection with or independent of photoplays. The artist further agrees that he will promptly and faithfully comply with all reasonable instructions, directions, requests, rules and regulations made or issued by the producer (defendant) in connection with the services to be performed by the artist hereunder; and that he will perform and render his services hereunder conscientiously and to the full limit of his ability and as instructed by the producer at all times and wherever required or desired by the producer."

"12. * * * in the event of the failure, refusal or neglect of the artist to perform or observe any of his obligations hereunder * * * as instructed, the producer, at its option, * * * may refuse to pay the artist any compensation during the period of such failure, refusal or neglect on the part of the artist, and shall likewise have the right to 'extend the term of this agreement and all of its provisions for a period equivalent to all or any part of the period during which such failure, refusal or neglect continues. If, at the time of such failure, refusal or neglect, the artist shall have been cast to portray a role in a photoplay, or shall have been directed to render any other of his required services hereunder, then and in either of said events, the producer shall have the right to refuse to pay the artist any compensation during the time which would have been reasonably required to complete the portrayal of said role and/or to render such other services, or (should another person be engaged to portray such role or to render such other services) until the completion of such role or such other services by such other person; and in any or either of such events the producer shall also have the right to extend the term of this agreement and all of its provisions for a like period of time, or for any portion thereof. Should the producer notify the artist that the artist has been cast to portray a role in a photoplay or to perform any other of his required services hereunder, and should the artist thereupon or at any time prior to the designated date of commencement of the rendition of such services, advise the producer that the artist does not intend to render such services, the producer shall thereupon, or at any time thereafter, have the right to refuse to pay the artist any compensation commencing as of the date on which the artist has so advised the producer of his intent not to perform, or, at the producer's election, as of any time thereafter, and continuing until the expiration of the time which would have been reasonably required to complete the portrayal of said role and/or to render such other services, or (should another person be engaged to portray such role or to render such other services) until the completion of such role or of such other services by such other person; and in any or either of such events the producer shall also have the right to extend the term of this agreement and all of its provisions for a like period of time or for any portion thereof. * * * Each and all of the several rights, remedies and options of the producer contained in this agreement shall be construed as cumulative and no one of them as exclusive of the others or of any right or priority allowed by law."

"13. If this agreement be suspended, or if the producer refuse to pay the artist compensation, pursuant to any right to do so herein granted to the producer, * * * if in connection with such suspension, refusal to pay * * *, the producer shall exercise the right to extend this agreement for a period equivalent to all or any part of the period of such suspension, refusal to pay * * *, then and in that event the running of the then current term or period of the artist's employment hereunder shall be deemed to be interrupted during the period of such suspension, refusal to pay * * *, but shall be resumed immediately upon the expiration of such suspension or * * * (in case of any such refusal to pay) upon the resumption of the payment of compensation, and * * * shall continue from and after the date of such resumption for a period equal to the unexpired portion of such term or period at the time of the commencement of such suspension, refusal to pay * * *, less a period equal to that portion, if any, of the period of such suspension, refusal to pay * * *, for which the producer does not exercise the right to extend this agreement."

"14. No waiver by the producer of any breach of any covenant or provision of this agreement shall be deemed to be a waiver of any preceding or succeeding breach of the same or any other covenant or provision."

"19. The artist expressly agrees that until the expiration of the term hereof he will be available at all times in Los Angeles, California, or at any other place the producer may designate, unless excused in writing by the producer. The artist further agrees that if and when requested by the producer to do so, he will report at the producer's studio, or at any other place the producer may designate, for wardrobe fittings, publicity interviews, publicity photograph sittings, making tests and/or 'stills,' and for such discussions as the producer may deem necessary or desirable; it being understood, however, that no compensation whatsoever shall be or become payable to the artist for the compliance, by the artist with such requests of the producer."

One additional aspect of the evidence remains to be noted. As conceded by defense counsel during the oral argument had at the close of the trial, plaintiff's version concerning what was said during the lengthy conference at Speer's office in the early part of April, 1943, and also his account of what they said during the telephone conversation which followed perhaps two days later, was corroborated in substance by the testimony of Speers except in the following important particular. The latter testified in effect that during said telephone conversation plaintiff represented that he had signed up for the duration of the war with the Civil Air Patrol, or some other military service, also that he had decided to devote 100% of his time to the war effort, and therefore would not work in pictures.

On the other hand, plaintiff has denied making any such statement either in whole or in part.

It is upon the record we have thus outlined that the issues raised herein must be determined.

As previously observed, defendant contends that by its telegraphic notice of April 10, 1943, it instructed plaintiff to report at its studio to perform two separate and distinct obligations, each of which was included among those he had agreed to perform under his contract. In this connection it is argued that by said notice he was called upon, firstly, for the rendition of his services in connection with the portrayal of a role in the photoplay "Fired Wife," and secondly, for the rendition of such other services as defendant might require under the contract. Accordingly defendant takes the position that by his failure to report at its studio on April 12, 1943, plaintiff breached the contract in the two respects above mentioned.

Plaintiff concedes that his failure and refusal to portray the role of Hank in the picture "Fired Wife" constituted a breach of the contract, and that such breach continued from the 12th of April to and including the 19th of the following month, at which time the substitute "engaged to portray such role" by defendant completed the same. However, he insists that he had not "been directed to render any other of his required services" under the contract. He further points out that the evidence convincingly shows that neither at the time the aforementioned notice was sent nor on April 12th did defendant intend to di-

rect him to render any of the other specific services which under the contract he had agreed to perform. Hence it is argued that when, following plaintiff's failure and refusal to report at the studio and portray the aforementioned role, defendant elected to and did exercise the right to engage another person to portray such role, it had "the right to refuse to pay the artist (plaintiff) any compensation," according to the terms of the contract, not for an indefinite period, but only "until the completion of such role" by the substitute. In other words, defendant's right to refuse to pay plaintiff any compensation terminated at midnight on May 19th, and he was entitled to have his suspension from the pay roll terminated at the same time.

It is true that one of defendant's executives, Daniel Kelley, testified to the effect that shortly prior to April 10, 1943, Speers had informed him that plaintiff had stated he would not play the role of Hank and had signed up to render his services exclusively for the Civilian Air Patrol for the duration of the war, and thereupon Kelley suggested either to Muhl or Ward that a wire be sent to plaintiff to ascertain whether it was true that he was not going to be able to do any more pictures for the duration of the war. According to this witness he wanted plaintiff at his office on April 12th to find out from him personally whether his objection was the role or because of his going into the Civil Air Patrol and if the latter, whether he would be unable to do any more pictures for the duration of the war, in which event defendant would have to plan for some other personality for the remaining pictures it had figured for plaintiff. However, this witness acknowledged that the notice of April 10th was neither prepared by nor submitted to him, and further that defendant had no intention of directing plaintiff to perform any services at that time other than to portray the role of Hank.

In considering the issues here raised we shall find it illuminating to refer to certain portions of the oral argument made in support of defendant's application for an injunction pendente lite. At that hearing it was conceded that the construction placed upon the contract by the parties, as evidenced by the practice which they had followed, was in substance that from time to time defendant produced certain pictures in each of which plaintiff was assigned to portray a particular role, that he was re-

quired to attend at the studio or wherever the picture was being produced, not daily, but only on such days as the producer needed his presence, and that plaintiff was paid compensation, not only during the times that he worked in pictures, but also during periods when he was not so engaged, and even when he was not present at the studio.

During the argument the Court called attention to the wording of defendant's notice of April 15, 1943, in which it advised plaintiff that particularly by reason of his failure to report to defendant on April 12th in accordance with its notice of April 10th, it elected to and did exercise the right to refuse to pay him any compensation, during the period of such failure, also that at the time of such failure he was cast to portray a certain role in a photoplay, that by reason of his failure it was engaging another person to portray such role, and that it elected to and did exercise the further right granted defendant under the provisions of Paragraph 12 of the contract to refuse to pay him any compensation until the completion of such role by such other person. This notice concluded with a reservation of all other rights and/or remedies.

The Court further pointed out that by its next notice dated May 18th, in the first paragraph thereof, defendant claimed it had suspended plaintiff by reason of his refusal to portray said role and also advised plaintiff that it had elected to extend the term of his employment for the period of such suspension. Reference was then made to the second paragraph of said notice which read: "Your employment under said contract, as amended, will be further suspended during the continuance of your present failure, refusal and/or neglect to perform your obligations thereunder, and we reserve the right to extend your employment under said contract, as amended, for an equivalent period." This document likewise concluded with a reservation of all other rights and/or remedies.

Thereupon the Court commented in substance that in view of the construction of the contract which the parties had placed thereon by the practice they had followed, it would appear that if defendant desired plaintiff to portray a role in a photoplay (other than "Fired Wife") or to perform any other service, plaintiff was entitled to be so advised by some new or further call to that effect on the part of defendant.

"How was he to know," inquired the Court at that time, "under this contract and the construction which the parties themselves gave to it, when his services were further needed unless he heard from the employer?"

To this, counsel then representing defendant responded: "* * * I don't think he would know when his services were needed, so far as acting in productions or reporting for tests or stills are concerned, but that is not the event which gives him his right to compensation. In other words, * * * he is entitled to compensation even though in a particular week or series of weeks he may not be near the studio. So that the fact that he will not know until he is notified that there is a production isn't the event which gives rise to his right to pay. * * * Certainly where a man refuses to play a role in a picture there is reason to believe, in the normal course of human events, that there is going to be trouble with this particular man. That is something that is perfectly plain. In other words, there has been some kind of an argument between the artist on the one hand and the studio on the other, which has resulted in the refusal of this man to play a role. Now, the question is, what is the future going to bring? The studio sends him notice, 'we are going to put you on suspension during your present failure, refusal or neglect to perform your obligations under your contract.'"

Whereupon the Court inquired, "What other obligations was he called upon to perform which he refused to discharge?"

Counsel's reply was: "Well, so far as the particular case giving rise to this is concerned, it was simply the refusal to play this role; * * *. But the important thing, as I see it, is his failure to comply with his obligations under the contract, and whether those obligations relate to the playing of a particular role, or whether they relate to any other obligation under the contract, does not affect the length of time during which he is to be put on suspension, because in either event the length of time is the continuance of his refusal and neglect to perform."

The Court next asked: "And what I am trying to find out is, to perform what?"

To this, counsel responded: "To perform whatever obligations he has under the contract."

Whereupon, the Court observed: "Again, it isn't clear to me which of the obliga-

tions, which under this contract he promised to perform, does the record disclose he failed to discharge?"

Defense counsel's reply was: "* * * the particular cause for suspension was his failure to portray this particular role, then he was put on suspension. In other words, his particular refusal was to portray a particular role. But what I am trying to suggest to the Court is that that is simply the essence in which he refused to perform his contract; * * * suppose under the contract the artist was obliged to appear on a radio show at a particular time upon request of the studio and he refused to do it. He said, 'I don't want to do it,' and he does not appear. The studio under this contract. I take it, could suspend him, even though the suspension notice might go out after the date when he was supposed to have gone on the radio. Then it would be up to the plaintiff, or to the defendant, as the case may be—I mean the artist—to say, 'Well, I have repented. I am ready to go back to work. Please lift my suspension.' In other words, the actual time it takes to do the act for which the suspension is made does not determine the length of the suspension."

Following some further discussion between the attorneys, defense counsel concluded by stating, "The question I was trying to suggest, in answer to your Honor's question, 'When would the artist know when the studio wanted him?' was, when did the studio know when the artist was going to come back and be a good boy, unless he told them so? In other words, is the interpretation to be urged here that where an artist has committed a material breach and the minimum period has expired, namely, when they have gotten a substitute, that irrespective of any manifestation of willingness on the part of the artist to come back to work and to be a good boy, the studio must then immediately put him on the payroll and continue paying him for weeks or months, maybe, before they even get a new role for him; without having any idea whether he is ever going to come back to work? That is the other side of the question with which we are concerned."

■ Thus at the hearing of its application for an injunction pendente lite, defendant took the position in effect that by reason of plaintiff's refusal to report at its studio on April 12th, and although it subsequently had employed another person to portray the role which he then declined to fill, and although the portrayal of such role had been completed by the substitute on May 19th, nevertheless, it was entitled to continue thereafter to refuse to pay him compensation, and to continue to extend the term of his contract, unless and until he should advise it that he was willing to perform his obligations under the contract. Carried to its logical conclusion, such contention could lead to a situation whereby defendant would secure control over plaintiff's services, not for the maximum period expressly limited by statute in California, to-wit, seven years, but for a much longer period, and perhaps for the balance of his natural life—a result obviously violative of public policy. Accordingly, this contention cannot be upheld.

The evidence introduced at the trial established without contradiction that where the existing circumstances were such as to afford no reason to believe or anticipate any difficulty, and it was desired to have the artist report at the studio, the practice usually followed was to telephone to him or his regularly designated agent requesting the artist to report accordingly, but that if the circumstances were otherwise and there was reason to believe the artist would not respond the notice was communicated in writing. Likewise, as heretofore pointed out, upon plaintiff's failure and refusal to report at the studio on April 12th, and as the result of conferences had between several of its executives, including Muhl, Kelley, Speers and Ward, defendant suspended plaintiff from its payroll, nor for the limited period required by the substitute it employed to portray the role he then declined to fill, or for any other limited time, but for an indefinite and unknown period, to-wit, for the duration of the war. However, in none of the notices which it caused to be served upon plaintiff did defendant disclose that fact.

Defendant justifies its adoption of this extreme course upon the ground that plaintiff, according to its executive Robert Speers, informed the latter he would not work in the aforementioned picture because he felt it was his duty to give 100% of his time to war work, and therefore was signing up with the Civil Air Patrol for the duration of the war. In the course of the oral argument at the close of the trial defense counsel stated: "Now there is of course a very decided conflict in the evidence with respect to what was said both

on April 3rd and April 5th. The plaintiff denies that he said that he was going into the Civil Air Patrol, or the Army, for the duration on April 3rd. I think that is the only real controversy with respect to that conversation. Generally speaking,.the parties, that is, Bob Speers and Bob Cummings, agree on the general substance of that conversation. Then we come, of course, to the more important conversation of April 5th on the telephone. In that respect, Bob Speers, refreshing his recollection from the memorandum made three months later, said that the following Monday he had a telephone conversation with Robert Cummings in which he stated that he had made up his mind not to do the picture because he felt that it was his duty to give 100% of his time to war work and therefore was signing up with the Civil Air Patrol for the duration. Here again we have a direct conflict in the evidence. To my mind, the credibility of Bob Speers is an important issue in the case because everything flows from that conversation of April 5th. If Robert Cummings didn't make that statement our affirmative defense of estoppel goes right out of the window."

We have heretofore pointed out several important portions of the evidence which cast serious doubt as to the accuracy of Speer's version concerning what was said between plaintiff and himself on this subject. Likewise, as previously noted, there were repeated instances, subsequent to April 12th and prior to May 29th, when at least one of defendant's executives engaged in a discussion in which it was proposed, either on behalf of plaintiff or at the suggestion of another that his contract be modified to the extent of permitting him to work in pictures for others as well as for defendant, most of these conversations having been held with plaintiff's agent, while two of them were had with an executive of another studio.

Again in its notice of April 15th defendant called particular attention to its claim that plaintiff had breached the contract in failing or refusing to report at the studio at a time when he was cast to portray a role in a certain photoplay, also pointed out that by reason of such failure or refusal it was engaging another person to portray such role, and further advised that it elected to and did exercise the right to refuse to pay him any compensation until the completion of such role by the substitute. How-

ever, while said notice unequivocally set forth defendant's position in the particulars just stated, the same failed to disclose that there was some other service or obligation which defendant was still calling upon plaintiff to perform at the studio.

Defendant's notice of May 18th was similar in character and placed emphasis upon the fact that by reason of his failure, refusal and/or neglect to perform his obligations under the contract plaintiff's employment had been suspended for a period of five weeks and two days commencing April 12th (the same being the time required by the substitute to portray the role of Hank) and accordingly that it elected to and did exercise the right to extend the term of his employment for an equivalent period.

Plaintiff's notice of May 29, 1943, is equally significant. By that document plaintiff called attention to the essence of defendant's notice of May 18th, also stated his position to the effect that there had been no failure, refusal and/or neglect to perform his obligations under the contract since the expiration of the aforementioned period of five weeks and two days, which ended on May 18th, and that compensation for the period subsequent to the latter date became payable to him on May 26th and further claimed that on the last mentioned date demand for the payment thereof was made, but that defendant refused to pay the same, and that accordingly, by reason of such refusal, he elected to and did terminate the contract. It is altogether unlikely that in said notice plaintiff would have alleged that three days previously demand had been made for payment of his compensation and that payment thereof had been refused, unless such occurrence had actually taken place.

Thus the evidence established quite convincingly that between April 13 and May 28, 1943, plaintiff pursued a course of conduct consistent with a purpose on his part to continue working in motion pictures, rather than to suspend such work during the war, and that repeatedly knowledge to that effect was brought home to the defendant, coupled with further information that he preferred to do pictures for others, in addition to making them for defendant, rather than exclusively for the latter. Under such circumstances, and in the face of the record heretofore outlined, it would be unreasonable to conclude that plaintiff had determined he would make no

more pictures for the duration of the war, or that he had made a representation to that effect to the defendant.

Rather does the evidence support the view that by the early part of April, 1943, a serious controversy had developed between plaintiff and defendant in connection with his objections to doing a type of picture which he feared would jeopardize his professional standing as an actor; that this controversy, coupled with his refusal to work in said picture, served to aggravate or revive in an aggravated degree the strained relations then existing between him and one of defendant's executives, and furthermore greatly angered, not only this official, but also at least two other executives of defendant; that accordingly they undertook to discipline and make an example of plaintiff or, to paraphrase an expression used by one of the counsel, to compel him to become a good boy. What these officials thereafter caused to be done, as well as what otherwise subsequently ensued, has already been described in some detail.

True, when plaintiff breached the contract on April 12th, defendant became entitled as a matter of law either to terminate the contract, or to avail itself of such rights as were granted to it thereunder. It adopted the latter alternative. One of these rights was to employ another person to portray the photoplay role which plaintiff had declined to fill. Another was to refuse to compensate him for the period required by the substitute to portray such role, in other words, suspend his employment for such time. A still further right was to continue the term of his contract for a corresponding period.

■ However, when defendant determined not to terminate the agreement but, instead, to avail itself of the several cumulative rights granted to it thereunder, it necessarily followed that the contract remained in force, not only for its benefit, but also for that of plaintiff. Hence, defendant was still bound to discharge such obligations as the agreement imposed on it. In other words, to paraphrase the rather trite expression that one may not eat his cake and have it too, in this instance defendant was not entitled to retain the rights accorded to it under the contract, and at the same time be relieved from its obligations thereunder.

The several thousand words comprising this document deal almost entirely with the obligations imposed upon plaintiff or the rights granted to defendant, or both. Virtually the only right given to the former and the correlative obligation imposed on the latter by the contract—certainly the most important from his standpoint—involved his right to compensation and its liability to pay the same. The refusal to pay such compensation, therefore, constituted a very material breach of the agreement and not a mere trivial one.

■ Consequently, when on April 12, 1943, defendant suspended plaintiff's employment for the duration of the war and removed him from its payroll, thereby barring him from compensation correspondingly, it rendered futile any subsequent demand for the payment of compensation owing to him for the period succeeding the completion by the substitute of the role of Hank. Such action on its part was unwarranted and arbitrary, and furthermore constituted an anticipatory breach of the contract. It also rendered unnecessary any demand for the payment of such compensation, for the law does not require the doing of an idle act. Accordingly plaintiff was not required to make such a demand as a condition precedent to terminating the contract, although as previously indicated, we have found such a demand was in fact made.

■ There is yet another serious factor which militates against the position of the defense, and which arises out of the circumstances surrounding the sending of the telegraphic notices of Saturday, April 10th. As already pointed out, these telegrams were not delivered to the telegraph office until after 6 P. M. that night, and yet they purported to instruct plaintiff to report at defendant's studio on the following Monday morning at 10 A. M. thereof. Later, on that same Monday, the telegraph company gave to defendant information of a character sufficient to apprise a reasonable person that if such telegram were intended to advise plaintiff he was needed at the studio for a conference with one of defendant's executives, or for any purpose other than to portray the role of Hank, then no adequate notice for that purpose had been given. Hence, even if defendant's explanation of the meaning of these telegrams were to be accepted—a construction with which we cannot agree—nevertheless, under the circumstances aforementioned we should still be obliged to find that such notice had not been given in time. For this additional reason defendant's con-

duct in suspending plaintiff's employment for the duration of the war must be held to have been arbitrary and unwarranted.

■ Let us now examine the contention that because, without defendant's knowledge or consent, plaintiff was absent from Los Angeles County from the 19th to the 29th of May, 1943, during which period he was engaged in activities connected with the Civil Air Patrol, he is barred from any relief herein. Without intending to repeat our analysis of the evidence relevant to this point, we deem it a sufficient answer to state that on the basis of the construction given to the contract by the parties themselves, as shown by the practice which they followed with respect to this matter up to May, 1943, plaintiff's physical presence was not required in Los Angeles County continuously during periods intervening between the production of pictures and while defendant was in contact with him through his known agent. As previously shown, at least two of defendant's executives were adequately informed concerning these activities on plaintiff's part, and not only did they fail to disapprove them, they also encouraged the same. Likewise as heretofore noted, on April 12th defendant suspended plaintiff's employment for the duration of the war, and hence it would have availed him nothing to have remained in Los Angeles County from and after May 19th.

■ There remains to be considered the defense that, if defendant breached the contract, such breach resulted from an excusable mistake, from which default it is entitled to be relieved; and that in consideration of such relief it is willing and offers to do full equity, including the payment of such compensation as the Court may find to be due him. As the record discloses, this defense was not interposed until after the lapse of more than six months after the agreement had been broken and plaintiff had given notice of termination thereof. Throughout that period defendant had insisted, both that it was not obligated to pay plaintiff any compensation, and also that the agreement still was in effect and prohibited him from working for anyone else. In fact, this plea was presented by way of a further amendment to the answer, as an additional defense, and without abandoning any other issue raised herein and was offered at a time when, during the course of the oral argument upon defendant's motion for an injunction pen-

dente lite, the court expressed doubt as to the soundness of the reasoning upon which defendant sought to justify its refusal to compensate plaintiff. Furthermore it should be observed that this offer to do equity is conditioned upon the Court first deciding that money or compensation became due from defendant to plaintiff on or after May 26, 1943. In other words, unless and until such a finding shall have been made, and only upon that condition, is defendant willing to do equity. As previously indicated, defendant's refusal to pay compensation to plaintiff on or after May 26, 1943, was arbitrary and unwarranted. It was not the result of mistake, unavoidable accident, fraud, surprise or ignorance. We are not persuaded that this offer to do equity is either timely or meritorious.

Accordingly, on the basis of the record as above outlined and for the reasons hereinbefore set forth, we conclude that at least by May 29, 1943, plaintiff became entitled to terminate the contract, and that on said date he elected to and did terminate the same; also that defendant has failed to establish any of the defenses pleaded herein; and that plaintiff is entitled to relief under the first count of the complaint, more particularly, to a decree adjudging the aforementioned contract to have been terminated on the last mentioned date.

■ At the trial we suggested that counsel consider whether there was any question as to the Court having jurisdiction of the subject matter of the second count, inasmuch as the same purported to be a cause of action to recover less than the sum of Three Thousand Dollars ($3,000) allegedly due under a contract. The record discloses that the present suit was originally filed in the Superior Court of the State of California, in and for Los Angeles County, and that the litigation was removed to this Court upon petition of defendant. Said petition alleged, among other matters, that the within cause is one and presents a controversy wholly between citizens of different states and that the matter in controversy, exclusive of interest and costs, exceeds in value the sum of Three Thousand Dollars ($3,000), said matter being the right of plaintiff to recover the sum of Ten Thousand Two Hundred and Fifty Dollars ($10,250) claimed to be due plaintiff from defendant as salary. Upon said petition the state court granted an order, finding that the within cause is wholly be-

tween citizens of different states, that the matter in controversy exceeds in value the sum of Three Thousand Dollars ($3,000), and that said action is one of which United States District Court is given jurisdiction, and adjudged that said cause be transferred and removed to this Court.

Further study convinces us that, although the parties proceeded to trial solely upon the issues raised by the first and second counts of the complaint and the answer and the amendments thereto, nevertheless, the matter of jurisdiction must be determined upon the state of the pleadings, more particularly the complaint when the suit was originally filed. Upon an examination of that record, we are satisfied that the Court has jurisdiction of the subject matter, as well as of the parties. As indicated by our previous analysis of the evidence, plaintiff became entitled to compensation from defendant on May 26, 1943, and also for the subsequent period up to the date of termination of the agreement. Hence, the findings and decree hereafter to be signed herein should include an award in the amount owing on account of such unpaid compensation.